# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **GEORGE CUSTER,** ) | |
| ) | **Civil Action No. 1:25-cv-190** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **SIMMONS BANK,** ) | |
| ) | |
| **Defendants.** ) | |

## INTRODUCTION

This complaint is an action to recover damages and illegal profits to prevent Defendant from benefiting from its law violations. The Complaint involves a mortgage loan servicer's failure to properly process a loan modification application from borrowers suffering from COVID after-effects and attempts to collect unlawful fees and costs. The Plaintiff brings this action to reinstate the loan and prevent the needless foreclosure of the home.

## JURISDICTION

1. Jurisdiction in federal court is appropriate under federal question jurisdiction for claims arising under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 et seq ("RESPA").

## PARTIES

2. The Plaintiff, George Custer, is a Marine veteran residing in the state of North Carolina.

3. Mr. Custer has lived on the subject property for 31 years.

4. <u>Servicer:</u> Simmons Bank is a mortgage loan servicing corporation with its principal place of business in a state other than North Carolina but which does business in North

1

Carolina. At all times, Simmons Bank is responsible for the actions of its subservicing agent Dovenmuehle Mortgage, Inc. (hereinafter "DMI" or "Dovenmuehle").

5. The Plaintiff is a "consumer" pursuant to the North Carolina Debt Collection Act.

6. Plaintiff is an unsophisticated real estate consumer who is not regularly engaged in the buying and selling of real estate.

7. The Plaintiff uses the residence for personal household use as his primary home.

## FACTUAL BACKGROUND

8. On or about September 4, 2007, the Plaintiff entered into a loan agreement with Taylor, Bean, & Whitaker Mortgage Corp. for the subject property with an interest rate of 6.875% and in the amount of $451,700.

9. Subsequently, the servicing rights for this loan were transferred to Defendant Simmons Bank, who retained Dovenmuehle as a subservicer.

10. The residential mortgage lending industry is generally divided between two types of loans. The vast majority of loans are "conforming" loans that "conform" with particular uniform terms, conditions, and amounts under a certain threshold set by the Federal Housing Finance Agency in coordination with Federal National Mortgage Association ("FNMA" or "Fannie Mae") and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"). FNMA and FHLMC are federally chartered corporations and are known as Government-Sponsored Enterprises ("GSEs"). In 2021, that funding threshold was $528,250 in many places, and up to $970,800 in higher cost-of-living areas. Loans that do not conform to these standards are typically "jumbo" loans and require more specialized underwriting due to the higher value of the property securing the mortgage.

2

11. Conforming loans include both government loans (i.e., those insured by the Federal Housing Administration, Veterans' Administration, or the U.S. Department of Agriculture), and conventional loans. Conforming loans must "conform" to the nationwide standards set by the GSEs, which purchase them to sell as pooled securities in the secondary market. To ensure ease of securitization, the GSEs create standard mortgage and deed of trust templates for all conventional loans, and the government agencies' templates are modeled after those GSE templates. While these templates contain sections for language that incorporates state requirements, this process too contains standardized language.

12. Because the conforming lending process depends on standardization, all borrowers go through the same process to obtain a conforming loan. Mortgage lenders typically use industry software to generate the standardized templates and complete the templates with the borrowers' information. Once approved to borrow the funds, the borrowers execute these standard loan documents ("Uniform Mortgages"). Because the GSEs will accept for securitization only those loans that adhere to their standard loan documents, a lender cannot add additional terms and there is no room for negotiation of any kind.

13. After the mortgage or deed of trust agreement is finalized, the mortgage lender often sells the mortgage loan to the GSEs, who in turn bundle that mortgage loan with other conforming loans to sell as securities to investors in the form of a mortgage-backed security — bond-like securities that are secured by the homes. While the original mortgage lender may remain to service the securitized and pooled loan, the primary servicer or GSE often retains another servicer or sub-servicer (such as DMI) that specializes in the actual management and administration of mortgages to perform the

3

servicing obligations required by the Uniform Mortgages.

14. Prior to COVID, Plaintiff was a mega-yacht captain by trade.

15. Plaintiff's wife was a massage therapist and personal trainer.

16. However, during the pandemic, Plaintiff contracted COVID and was left seriously ill.
    Due to complications from the illness, Plaintiff could not return to his prior career.

17. Both Plaintiff and his wife's income were significantly harmed by COVID shutdowns.

18. Thereafter, Plaintiff was able to find work in other areas, but during the pandemic
    Plaintiff fell behind on his mortgage.

**A.  Loan Mod Runaround and Dual Tracking to Foreclosure**

19. Upon Plaintiff's request, Defendant placed the loan in forbearance through June 2021.

20. Defendant advised Plaintiff to withhold payments after the forbearance while he applied
    for a loan modification.

21. Plaintiff needed a loan modification due to the career change forced upon him by his
    long-COVID condition.

22. Plaintiff made numerous attempts to modify his mortgage in order to bring it current, but
    Defendant constantly lost paperwork submitted by Plaintiff and requested new copies of
    already submitted documents.

23. In August 2022, Plaintiff filed a complaint with the federal Consumer Financial
    Protection Bureau due to Defendant's unwillingness to process the loan modification
    application.

24. On or around September 9, 2022, Defendant promised focused help and a specific point
    of contact.

25. On September 24, 2022, Plaintiff had submitted all requested documentation for his loan

4

modification application.

26. However, on October 19, 2022, Defendant informed Plaintiff that his loan modification request had been denied because it had "timed out" on October 7, 2022, without being completed.

27. This was false.

28. Plaintiff had submitted a completed loan modification application on September 24, 2022 via the specific point of contact that Defendant had assigned.

29. Plaintiff complained to the North Carolina Commission of Banks.

30. Defendant required Plaintiff to submit yet another loan modification application.

31. Plaintiff, desiring to save his home, complied with every request from Defendant.

32. By November 1, 2022, Plaintiff had provided Defendant with all requested documentation for his loan modification application yet again.

33. Defendant recommended to the holder of the note to proceed with foreclosure on November 8, 2022, despite advising Plaintiff that Defendant was still reviewing a loan modification application.

34. Defendant continued to allege that the loan application was incomplete in December 2022 and demanded additional documentation in January 2023.

35. In April 2023, Defendant confirmed that it had received a completed application during a phone call with Plaintiff's wife, who had been authorized by Plaintiff to discuss the loan with Defendant.

36. After Defendant took no action upon the completed loan modification application, Plaintiff submitted another complaint to the CFPB and contacted the North Carolina Attorney General's Office.

5

37. Defendant admitted that a 'typo' caused a delay in April 2023 and apologized for its error.

38. On May 9, 2023, Defendant again confirmed that it had received a completed loan modification application from Plaintiff during a phone call.

39. On May 10, 2023, Defendant communicated that it would take 30 days to review the completed application and represented that it had not started the foreclosure process.

40. This was false.

41. Defendant had mailed Plaintiff a notice of acceleration and right to cure default in April 2023.

42. During this timeframe, Defendant further accrued additional interest to Plaintiff's loan account.

43. On June 1, 2023, Defendant spoke to Plaintiff's wife and informed her that Defendant approved a loan modification.

44. Defendant told Plaintiff to expect the documents soon and that Plaintiff would have 30 days to review, sign, and return.

45. Defendant told Plaintiff that if accepted, the modified loan payments would begin on August 1, 2023.

46. On June 27, 2023, Plaintiff had still not received the loan modification paperwork that Defendant had promised to mail out on June 1.

47. On July 5, 2023, Plaintiff's wife spoke with Dorothy Bondi at DMI who advised that DMI had not sent out the loan modification yet but that Plaintiff could expect it soon.

48. Defendant had previously told Plaintiff on June 1, 2023 that it had sent out the loan modification offer but admitted in this July 5 call that DMI had not sent the offer.

49. On July 10, 2023, Plaintiff's wife called Defendant to obtain the tracking number on the mailed loan modification application as instructed by Dorothy Bondi on July 5.

50. However, Defendant advised that there were no updates on the account and that the offer had not been mailed at that point.

51. Plaintiff's stress and anxiety grew because the due date for the modified payment was August 1, and he still had not been able to review the terms of the modification offer.

52. The modification offer finally arrived on July 20, 2023 – only eleven days before the first payment would be due.

53. The modified loan payment was $3,058.17 a month.

54. Plaintiff's original monthly payment was $3,081.54 – a monthly savings of only $23.37.

55. Defendant did not provide Plaintiff with 30 days to review the terms of the modification offer as promised on June 1, 2023.

56. The new principal balance on the loan would be $448,696.23 with $82,869.60 in capitalized interest.

57. Upon information and belief, much of the capitalized interest would not have been necessary had Defendant not lost Plaintiff's loss mitigation paperwork numerous times.

58. The modified monthly payment provided no help for Plaintiff, who had been forced to switch careers and lower his income due to his COVID illness.

59. Anxious to keep the property where he had lived for 31 years, Plaintiff thereafter made his August payment as listed on the modification paperwork in the amount of $3,089.17.

60. Plaintiff signed the loan mod paperwork and submitted the first payment to Defendant.

61. As a matter of industry practice, home mortgage servicers engage in loss mitigation in lieu of foreclosure when a borrower has demonstrated an intent, willingness, and ability

to retain the home and continue making payments.

62. Instead of putting forth a good faith effort to achieve a sustainable payment plan with the Plaintiff, Defendant refused to process the Plaintiff's requests for appropriate loss mitigation, despite inviting the Plaintiff to do so. Instead, the Defendant pursued foreclosure.

63. If Plaintiff had known that Defendant would not provide realistic assistance and would pursue foreclosure, Plaintiff would have sought alternatives to satisfy his mortgage obligation.

64. Plaintiff would not have faced foreclosure or been forced to accept a modification that provided no benefit and added massive amounts of interest to the principal balance but for Defendant's extended, fruitless loss mitigation process and misleading and contradictory statements.

65. Defendant's errors and its subsequent misconduct resulted in the Plaintiff not being able to take advantage of FHA's Covid-19 Recovery Loss Mitigation options, including an Advance Loan Modification (ALM) or Covid-19 Recovery Modification.

66. FHA's Covid-19 Recovery Loss Mitigation Options do not require a fully underwritten application.

67. As a conforming loan, Plaintiff was entitled to the FHA Covid-19 Recovery Loss Mitigation protections.

68. FHA's waterfall analysis should have resulted in a loan modification offer but Defendant misrepresented the requirements of the program while collecting the debt and obtaining information about the Plaintiff.

69. Upon information and belief, Defendant never considered Plaintiff for an Advance Loan

Modification (ALM) or Covid-19 Recovery Modification that do not require a fully underwritten application.

70. Plaintiff has suffered stress, annoyance and inconvenience, and fear of loss of home.

**B.   Defendant fails to record the mod and charges unlawful fees**

71. Plaintiff attempted to make the September 2023 payment online, but Defendant would not allow access to its online payment portal.

72. When Plaintiff's wife, Linda Pleasants, called in to Dovenmuehle to make the September payment she was told that she did not have online access because the loan modification had not been recorded yet.

73. Defendant advised that she could not pay online.

74. Defendant offered to accept a payment over the phone.

75. For unknown reasons, Defendant did not charge the full amount of the modified loan and instead directed Plaintiff to pay $2,876.89, which she did, for that payment.

76. Open information and belief, the agent who informed Plaintiff to make the $2,876.89 payment was in error as this was not a full payment, and the funds were placed in suspense.

77. Thereafter, Defendant's collection department called to collect the deficient payment balance.

78. After that, Ms. Pleasants called in again and made a payment in the amount of $416.28.

79. This was also placed in suspense, for some reason, the full payment was not posted to Plaintiff's account.

80. Thereafter, Plaintiff received a mortgage statement dated September 12, 2023, showing a payment amount due and owing of $3,058.17 and a past due amount of $3,058.17.

81. The Plaintiff had made all of the required payments for the loan modification and signed all of the required paperwork at this time.

82. The September 12, 2023 statement shows numerous entries that include "long form misapplication reversals" and "loss mitigation costs."

| Transaction Activity (8/17/2023 to 09/12/2023) | | | | |
|---|---|---|---|---|
| Date | Description | Charges | Payments | Escrow Activity |
| 08/01 | Payment - Thank you | $0.00 | ($55.00) | $0.00 |
| 08/18 | Long Form Misapplication Reversal | $0.00 | $-4,213.45 | $0.00 |
| 08/18 | Long Form Misapplication Reversal | $0.00 | $4,213.45 | $0.00 |
| 08/18 | Payment - Thank you | $0.00 | ($4,009.45) | $0.00 |
| 08/25 | Long Form Misapplication Reversal | $0.00 | ($180.00) | $0.00 |
| 08/25 | Property Inspection Fee | $-55.00 | $0.00 | $0.00 |
| 09/01 | Payment - Thank you | $0.00 | $2,876.89 | $0.00 |
| 09/05 | Long Form Misapplication Reversal | $0.00 | ($235.00) | $0.00 |
| 09/07 | Loss Mitigation Costs | $0.00 | $-204.00 | $0.00 |
| 09/08 | Payment - Thank you | $0.00 | $416.28 | $0.00 |

83. Upon information and belief, a "long form misapplication reversal" occurs when a loan modification fails.

84. Upon information and belief, Plaintiff's loan modification was fine, and Plaintiff had performed all his obligations correctly.

85. Further, numerous unknown fees are packed into this transaction detail, including a $55 payment for property inspection fee and $204 in "loss mitigation costs."

86. The past payment breakdown on the September 12, 2023, statement is equally cryptic. It looks like this:

| Past Payments Breakdown | | |
|---|---|---|
| Description | Paid Last Period | Paid Year to Date |
| Principal | $-3,124.75 | $-3,124.75 |
| Interest | $4,671.70 | $4,671.70 |
| Escrow (Taxes and Insurance) | $4,600.39 | $4,600.39 |
| Fees | $408.00 | $408.00 |
| Partial Payment (Unapplied)* | $-3,089.17 | $0.00 |
| Total | $3,466.17 | $6,555.34 |

87. It indicates that no payment has been applied to the prior month's balance due because an

10

additional $408 in fees were added to the mortgage. There is no indication of what those fees are in this statement.

88. On October 2, 2023, Defendant mailed a collection notice outlining the following fees and the date those fees were allegedly assessed:

    a. 07/24/2023; $10.00; LOSSMIT ATTY FEE

    b. 07/24/2023; $125.00; LOSSMIT ATTY FEE

    c. 09/07/2023; $31.00; LOSSMIT COSTS

    d. 06/22/2023; $125.00; LOSSMIT COSTS

    e. 07/24/2023; $5.00; LOSSMIT ATTY FEE

    f. 09/07/2023; $204 .00; LOSSMIT COSTS

89. Four of the fees were allegedly incurred by Defendant more than thirty days before Defendant sent this notice to Plaintiff.

90. Plaintiff's wife attempted to make the November 2023 payment on October 31, 2023 by calling Simmons Bank, who had assumed servicing responsibilities from DMI.

91. Simmons Bank advised Plaintiff's wife that the loan was past due for October and a November payment of $3,262.82 was currently due.

92. Plaintiff's wife advised that the modified loan amount was $3,058.17 and that the October payment had been timely made.

93. Simmons Bank representative Cassidy could not explain the discrepancy in the payment amount or why the October payment had not been credited.

94. Cassidy represented that Simmons Bank was not reporting late payments for 60 days for customers "like them."

95. Cassidy represented to Plaintiff's wife that Simmons Bank took servicing duties away

from DMI due to problems customers were having with DMI.

96. Cassidy represented to Plaintiff's wife that she was reviewing Simmons Bank communications with DMI.

97. Cassidy represented that Simmons Bank had told DMI that DMI was not giving an appropriate modification to Plaintiff.

98. On November 17, 2023, Cassidy emailed Plaintiff and confirmed that Simmons Bank and DMI had been charging the incorrect monthly payment amount and had modified the payment as promised to $3,058.17.

99. Defendants had misrepresented the amount due.

100.     Defendants communicated directly with Plaintiff after it had been notified by Plaintiff's attorney that Plaintiff was represented.

## CLASS ACTION ALLEGATIONS

101.     Plaintiff incorporates the preceding paragraphs as if stated herein.

102.     This action is also filed as a class action against the Defendant. Plaintiff, serving as class representative, tentatively defines the class, subject to modification after discovery and case development, as follows:

**North Carolina Loss Mitigation Class:** All persons residing in North Carolina with mortgage loans serviced by Defendants who were charged fees in North Carolina and who received notice of the fee more than 30 days after the fee was assessed during the applicable statute of limitations.

103.     Plaintiff reserves the right to refine the class definition in light of discovery and additional investigation.

104.     The putative class is so numerous that joinder of all members is impractical.

105.     There are questions of law and fact common to the putative class which predominate over any questions affecting only individual class members.

12

106.    The principal common issues involve whether Defendant's conduct regarding the aforementioned charges resulted in unjust enrichment by Defendant.

107.    One or more of Plaintiff's claims are typical of those of the putative class, and said claims are based on the same legal and factual theories.

108.    Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has suffered pecuniary injury as a result of Defendant's actions and will, accordingly, vigorously litigate this matter. Plaintiff is greatly annoyed at being the victim of Defendant's illegal and fraudulent conduct and wish to see that wrong remedied. To that end, Plaintiff has retained counsel experienced in claims involving unfair business practices.

109.    Neither the Plaintiff nor his counsel have any interest that might prevent them from vigorously pursuing this claim.

110.    A class action is a superior method for the fair and efficient adjudication of this particular claim and controversy.

111.    The interest of putative class members in individually controlling and maintaining the prosecution of separate claims against Defendant is small given that they are unlikely to be aware of their legal rights and the amount of statutory or actual damages in an individual action is relatively small.

112.    The management of this class claim is likely to present significantly fewer difficulties than those presented in many larger, and more complex, class actions.

113.    As a proximate and/or foreseeable result of Defendant's wrongful conduct, each member of the putative class has suffered actual and/or statutory damages.

### CLASS ACTION CLAIMS FOR RELIEF

**UNLAWFUL DEBT COLLECTION – LOSS MITIGATION FEES**
**(CLASS ALLEGATION)**

114.     The Plaintiff incorporates the previous paragraphs as if fully set forth herein.

115.     The Defendant assessed fees on July 24, 2023 against Plaintiff for three separate itemized Loss Mitigation Attorney fees.

116.     Because Plaintiff had not signed the loan modification agreement at that time, Defendant was not sending periodic statements itemizing fees.

117.      Defendant did not mail a notice of these fees until October 2, 2023.

118.     *N.C. Gen. Stat.* § 45-91(1)(b) requires that "[a]ny fee that is incurred by a servicer shall be…[e]xplained clearly and conspicuously in a statement mailed to the borrower at the borrower's last known address within 30 days after assessing the fee."

119.     Defendant did not explain clearly and conspicuously to Plaintiff the fees allegedly incurred and assessed on July 24, 2023.

120.     *N.C. Gen. Stat.* § 45-91(3) provides that "[f]ailure to charge the fee or provide the information within the allowable time and in the manner required under subdivision (1) of subsection (a) of this section constitutes a waiver of such fee."

121.     Despite the waiver of the fee, Defendant assessed the fee to Plaintiff's and other similarly situated mortgage borrowers' loans.

122.     Defendant "[f]alsely represent[ed] the character, extent, or amount of a debt against" Plaintiff, in violation of *N.C. Gen. Stat.* § 75-54(4).

123.     "The specific and general provisions of this Article shall exclusively constitute the unfair or deceptive acts or practices proscribed by G.S. 75-1.1 in the area of commerce regulated by this Article." *N.C. Gen. Stat.* § 75-56(a).

14

124.    The Plaintiff and others similarly situated were harmed by the Defendant's conduct in that the waived fees were improperly charged and/or collected in violation of *N.C. Gen. Stat.* § 75-56.

125.    The Plaintiff and others similarly situated were harmed by the Defendant's conduct in that the mortgage servicer failed to uphold the public policy of North Carolina.

126.    As a result of the Defendant's actions, the Plaintiff and others similarly situated have suffered economic losses and emotional distress.

127.    As a result of the Defendant's actions, the Plaintiff and others similarly situated have been annoyed, inconvenienced, bothered, upset, angered, and otherwise caused indignation and distress.

## COUNT II

### *UNJUST ENRICHMENT*
### *(CLASS ALLEGATION)*

128.    The Plaintiffs incorporate the previous and all following paragraphs as if fully set forth herein.

129.    Defendant serviced mortgage loan contracts with the Plaintiff and all others similarly situated.

130.    Defendant was unjustly enriched when it assessed fees that it was not entitled to and for fees that should have been waived due to a failure to provide timely notice.

131.    As a result of the Defendant's actions, Defendant was unjustly enriched at the expense of Plaintiff and all others similarly situated.

## INDIVIDUAL CLAIMS FOR RELIEF

## COUNT III

### *VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT*

15

132.   The Plaintiffs incorporate the previous and all following paragraphs as if fully set forth herein.

133.   The Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 et seq ("RESPA"), provides that "a servicer of a federally related mortgage shall not…fail to comply with any other obligation found by the Bureau of Consumer Financial Protection ("CFPB"), by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

134.   The CFPB promulgated regulations pursuant to RESPA and created a private right of action for consumers for violations of 12. C.F.R. 1024.41.

135.   Plaintiff complied with every request to complete their loss mitigation application.

136.   Nonetheless, Plaintiff's application was denied because, although they had complied with every request, Defendant still alleged that the application was not complete.

137.   Defendant failed to send a notice stating additional documents and information that were necessary and the reasonable date and/or sent a notice that was confusing and contradictory in violation of 12 C.F.R. 1024.41(b)(2)(i)(B) and (b)(2)(ii).

138.   Defendant failed to exercise reasonable diligence in obtaining documents and information from Plaintiff to complete their loss mitigation application because Plaintiff complied with every request from Defendant and yet Defendant still claimed it needed additional documentation for Defendant's review, in violation of 12 C.F.R. 1024.41(b)(1).

139.   Defendant failed to review the allegedly incomplete loss mitigation application for available options in its discretion in violation of 12 C.F.R. 1024.41(c)(2)(ii-iii).

140.  Plaintiff submitted a complete loan modification application.

141.  Plaintiff's application was facially complete because they had submitted all documents and information to Defendant for review.  See 12 C.F.R. 1024.41(c)(2)(iv).

142.  Defendant failed to evaluate Plaintiff's completed loss mitigation application for all loss mitigation options available to Plaintiff in violation of 12 C.F.R. 1024.41(c)(1)(i).

143.  Defendant failed to act and carry out its duties under the regulations in good faith by refusing to review Plaintiff's loss mitigation application for available options in its discretion in violation of 12 C.F.R. 1024.41(c)(2)(ii).

144.  Defendant dual tracked Plaintiff's loan in violation of 12 C.F.R. 1024.41(g).

145.  Defendant failed to send notice of completed application within 5 business days containing (1) date servicer received complete application, (2) 30 day timeline to evaluate, and (3) certification that cannot foreclose before evaluating the complete application in violation of 12 C.F.R. 1024.41(c)(3)(i).

146.  Plaintiff mailed Defendant a notice of error and qualified written request in November 2023.

147.  Defendant violated 12 C.F.R. § 1024.35(e)(1)(i) by failing to correct the error with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(2) Conduct a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its

17

determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

148.    Defendant violated 12 C.F.R. § 1024.36(d) by failing to provide the Plaintiff with the requested information and contact information, including a telephone number, for further assistance in writing; or conduct a reasonable search for the requested information and providing the Plaintiff with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

**COUNT IV**

***VIOLATIONS OF NORTH CAROLINA DEBT COLLECTION ACT (NCDCA)***

149.       The Plaintiff incorporates the previous and all following paragraphs as if fully set forth herein.

150.    Plaintiff signed a loan modification agreement on July 28, 2023, that set his new monthly payment obligation at $3,058.17.

151.    Defendant thereafter charged varying amounts that misrepresented the actual amount owed.

152.    Defendant received a letter from Plaintiff's attorney stating that Plaintiff was represented.

153.    Nonetheless, Defendant continued to communicate directly with Plaintiff.

154.    Defendant committed *per se* and general unfair or deceptive acts or practices in the servicing of Plaintiff's loan, including, but not limited to, the following:

a. Communicating with a consumer (other than a statement of account used in the normal course of business) whenever the debt collector has been notified by the consumer's attorney that he represents said consumer in violation of *N.C. Gen. Stat.* § 75-55(3);

b. Falsely representing the character, extent, or amount of a debt against a consumer in violation of *N.C. Gen. Stat.* § 75-54(4);

c. Threatening to take any action not permitted by law, including foreclosure, in violation of *N.C. Gen. Stat.* § 75-51(8).

155.     As a result of the Defendant's actions, Plaintiff has been annoyed, inconvenienced, harassed, bothered, upset, angered, suffered significant out-of-pocket loss, and otherwise caused indignation and distress.

## COUNT V

### *VIOLATIONS OF NORTH CAROLINA UNFAIR TRADE PRACTICES ACT*

156.     The Plaintiff incorporates the previous paragraphs as if fully set forth herein.

157.   Defendant committed *per se* and general unfair or deceptive acts or practices in the servicing of Plaintiff's loan, including, but not limited to, the following:

a. Failing to comply with Plaintiff's request for information about the home loan account and to respond to any dispute initiated by the borrower about the loan account in violation of *N.C. Gen. Stat.* § 45-93;

b. Failing to "[a]ct with reasonable skill, care, and diligence" in violation of *N.C. Gen. Stat.* § 53-244.110(3);

c. Failing to "to negotiate with the borrower, subject to the mortgage servicer's duties and obligations under the mortgage servicing contract, if any, to attempt a

19

resolution or workout to the delinquency" in a reasonable manner in violation of *N.C. Gen. Stat.* § 53-244.110(7);

d. engaging in "any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person in connection with the …servicing of any mortgage loan" in violation of *N.C. Gen. Stat.* § 53-244.111(8); and

e. failing to "comply with applicable State and federal laws and regulations related to mortgage lending or mortgage servicing" in violation of *N.C. Gen. Stat.* § 53-244.111(14).

158.     As a result of the Defendant's actions, the Plaintiff accrued significant interest on his mortgage loan while Defendant failed to timely and diligently process his loan modification application.

159.     Defendant's unfair and deceptive acts or practices affected commerce related to Plaintiff's loan in violation of *N.C. Gen. Stat.* § 75-1.1.

160.     As a result of the Defendant's actions, Plaintiff has been annoyed, inconvenienced, harassed, bothered, upset, angered, suffered significant out-of-pocket loss, and otherwise caused indignation and distress, including fear of losing his home of 31 years.

## COUNT VI

### *COMMON LAW NEGLIGENCE*

161.     The Plaintiff incorporates the previous paragraphs as if fully set forth herein.

162.     The Defendant was aware that Plaintiff was applying for loss mitigation due to a financial hardship created by the COVID-19 virus.

163.     Defendant agreed to process Plaintiff's application for loan assistance and owed a

duty to timely and adequately obtain and review all necessary documentation to evaluate

the loan modification application.

164.     Defendant breached its duty to the Plaintiff when it told the Plaintiff to stop

making payments during the loan modification application process, allowed the loan

modification process to drag out over a period of years, repeatedly losing documents,

requesting the same documents already in its possession, and otherwise failing to provide

the assistance after assuming a duty to reasonably act to provide assistance with the

mortgage loan.

165.   The Plaintiff was harmed by the Defendant's conduct in that the Plaintiff has accrued

significant interest on his loan that would have been paid much sooner and not accrued in

those amounts had Defendant not advised Plaintiff to stop making payments and had

timely processed and evaluated the loan modification application.

166.    As a result of the Defendant's actions, the Plaintiff has suffered economic losses and

emotional distress.

167.     As a result of the Defendant's actions, the Plaintiff has been annoyed,

inconvenienced, bothered, upset, angered, and otherwise caused indignation and distress.

### DEMAND FOR RELIEF

Plaintiffs demand from the Defendant on their behalf and on behalf of all those similarly

situated:

a.   That the Court enter a permanent injunction against Defendant ordering it to cease and

desist from engaging in the unlawful acts described hereinabove;

b.   That the Court enter a permanent injunction against the Defendant ordering it to establish

an ongoing training program for their employees on the subject of consumer rights in North Carolina;

c. Certify the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure for Defendant's unlawful collection of improperly disclosed fees;

d. Award statutory damages and/or penalties to Plaintiff and the proposed Class as permitted by law for Defendant's unlawful collection of improperly disclosed fees;

e. That the Plaintiff be awarded damages against the Defendant, in an amount to be determined at trial, that fairly and reasonably compensate Plaintiff for moneys lost as a result of Defendant's unlawful acts;

f. That Plaintiff be awarded additional damages against the Defendant, in an amount to be determined at trial, that fairly and reasonably compensate Plaintiff for emotional and mental distress, loss of use, aggravation, anxiety, annoyance and inconvenience suffered as a result of the Defendant's unlawful acts;

g. That Plaintiff be awarded consequential and incidental damages against the Defendant in an amount to be determined at trial;

h. That Plaintiff be awarded treble damages pursuant to *N.C. Code* § 75-1-16 of the North Carolina Consumer Credit and Protection Act;

i. That Plaintiff be awarded not less than five hundred dollars ($500.00) nor greater than four thousand dollars ($4,000) for each violation of *N.C. Gen. Stat.* § 75-56;

j. That Plaintiff be awarded actual damages for common law and pursuant to 12 U.S.C. 2605(f)(1)(A);

k. That the Plaintiff be awarded statutory damages as permitted pursuant to 12 U.S.C. 2605(f)(1)(B);

22

l.  That Plaintiff be awarded punitive damages against the Defendant, in an amount to be determined at trial, for the willful, wanton and/or reckless disregard for their legal rights;

m.  That the Plaintiff be awarded his costs, including reasonable attorney's fees, pursuant to N.C. Code § 75-1-16.1 and 12 U.S.C. 2605(f)(3);

n.  That the Plaintiff be awarded appropriate restitution and that the Defendant be required to disgorge all ill-gotten gains;

o.  That Plaintiff be awarded any and all additional damages against the Defendant in an amount to be determined at trial; and

p.  That Plaintiff be awarded such further and general relief as this Court may deem appropriate under the attendant circumstances.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

**GEORGE CUSTER,**
**ON BEHALF OF HIMSELF AND**
**ALL OTHERS SIMILARLY SITUATED**
BY COUNSEL

BY:  **/s/ Benjamin M. Sheridan**
Benjamin M. Sheridan (# 52734)
Jed R. Nolan (# 56899)
*Counsel for Plaintiffs*
Klein & Sheridan, LC PC

**Mailing Address:**
964 High House Rd. PMB 2039
Cary, NC  27513

**Physical Office:**
2500 Regency Parkway
Cary, NC  27518

ben@kleinsheridan.com
jed@kleinsheridan.com
phone: (919) 899-9533
fax: (304) 562-7115

23